

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CMM                                          *610 Federal Plaza*
F. #2017R01994                               *Central Islip, New York 11722*


                                        October 28, 2022


By ECF

The Honorable Joanna Seybert
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, 11722

            Re:    United States v. Mara Ficarra
                   Criminal Docket No. 18-CR-679 (S-1) (JS)

Dear Judge Seybert:

            The government respectfully submits this letter in advance of the defendant Mara
Ficarra's sentencing in the above-captioned matter, which is scheduled for November 4, 2022. On
June 6, 2022, the defendant pleaded guilty, pursuant to a plea agreement, to a one-count
superseding information, charging the defendant with conspiracy to commit mail, wire and bank
fraud. As set forth in the Presentence Investigation Report ("PSR"), the defendant's applicable
United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range is 46 to 57 months'
imprisonment. For the reasons set forth herein, and as set forth in the negotiated plea agreement,
a sentence of no more than 41 months' imprisonment is sufficient, but not greater than necessary,
to achieve the goals of sentencing in this case. (See Plea Agreement, ¶ 5(b).) The government
also requests that the Court delay entering an order of restitution pending the government's
provision, within 90 days, of detailed victim loss information.[1]

I.          Background

            The PSR accurately summarizes the offense conduct. (See PSR ¶¶ 4-9.)

            The defendant and her late husband owned and operated various corporations,
including, but not limited to, Remington Biographies Inc., Remington Bookkeepers Inc., and
Mentorship America1 Inc. (collectively, the "Remington Entities"). (PSR ¶ 4.) The defendant
was the Chief Executive Officer ("CEO") of Remington Bookkeepers and the Treasurer and

---

            [1]    The government anticipates that total restitution will be in the range of
approximately $1.5 to $1.9 million.

Secretary of Mentorship America1.  The defendant's late husband was the CEO of Remington Biographies and the President of Mentorship America1.  (Id.)

The Remington Entities purported to publish reference publications generally containing concise biographical information of individuals from across the country.  Reference publications included "Inspiring The Youth of America" and "The Remington Registry of Outstanding Professionals" (the "Remington Registry").  The defendant and her late husband operated the Remington Entities out of their residence in Southampton, New York.  (Id. ¶ 5.)

Between January 2013 and December 2018, the defendant and her late husband engaged in a large-scale mail and check fraud scheme targeting elderly victims across the United States.  (Id. ¶ 6.)  The sent mailings inducing thousands of individuals (the "Victims") to send checks of nominal value, such as $14.00, in payment for inclusion in the Remington Entities' reference publications.  These mailings indicated that the Victim's biography would be published in the Remington Registry reference publication produced by Remington Biographies, Inc.  (Id.) The letters, which were addressed to "Dear Nominee," stated that "Your 2 books and your plaque are paid for in full and ready for delivery.  Please send a check for 14.00 dollars for shipping and handling.  Make check payable to Remington Biographies.  Place check in envelope we provided and mail it to us promptly."  (See id.; see also Superseding Information at ¶ 4.)

The pamphlet described the Remington Registry reference publication and stated, in pertinent part, that "The Remington Registry of Outstanding Professionals is more than a website, more than a book, more than a Biographical index and certainly more than a who's who. It is the ultimate expression of achievements, hardships, and dedication that professionals have made in their lives and careers.  The Registry is perhaps one of the most powerful inspirational tools in existence today.  Each Biography is painstakingly produced with respect and admiration first and foremost."  The pamphlet further stated:  "At this point we wish to welcome your inclusion.  We encourage you to keep an open mind and fill out the provided questionnaire as best you can.  Set back and be ready for a wonderful experience."  The pamphlet was signed by the defendant's late husband, as the Managing Director of Remington Biographies, and the address for the Remington Registry on the pamphlet was the defendant's and her late husband's residence in Southampton.  (See PSR ¶ 6; see also Superseding Information at ¶ 5.)

In response to receiving these letters and pamphlets, thousands of victims sent checks to the defendant and her late husband as payment for inclusion in the Remington Entities' reference publications.  (PSR ¶ 6.)

Upon receipt of these checks for "shipping and handling," the defendant and her late husband used the banking and routing information from those checks to create fabricated checks in larger amounts.  (PSR ¶ 7.)  The fraudulent checks were type-written in similar fonts, and contained a stamp on the signature line that stated as follows:  "Signature Not Required.  Your depositor has authorized this payment to payee.  Payee to hold you harmless for payment of this document.  This document shall be deposited only to the credited payee." (Id.)  The defendant and her late husband then caused the fabricated, fraudulent checks to be deposited, without authorization, into various bank accounts controlled by the defendant and her late husband, by various means, including, but not limited to, mobile deposit interstate wire transmissions.  The

defendant and her late husband then withdrew cash from these accounts. (Id.) Various financial institutions, the deposits of which are insured by the FDIC, processed the fraudulent checks. (Id.)

In total, the defendant and her husband caused the more than unauthorized deposit and transfer of $1.9 million from the victims' bank accounts. (Id. ¶ 8.)

## II.    The Presentence Investigation Report

### A.    The United States Sentencing Guidelines

On September 13, 2022, the United States Probation Department issued the PSR. The PSR set forth the following Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§§ 2X1.1(a), 2B1.1(a)(2)) | | 6 |
| Plus:   Loss More than $1.5 Million (§ 2B1.1(b)(1)(I)) | | +16 |
| Plus:   Involved 10 or More Victims (§ 2B1.1(b)(2)(A)) | | +2 |
| Plus:   Sophisticated Means (§ 2B1.1(b)(10)(C)) | | +2 |
| Minus: Acceptance of Responsibility (§ 3E1.1(a), (b)) | | -3 |
| Total Adjusted Offense Level: | | 23 |

(PSR ¶¶ 13-25.) Based on a total offense level of 23 and a Criminal History Category I, the advisory Guidelines range is 46 to 57 months' imprisonment. (PSR ¶ 62.) The government does not object to the Guidelines calculation contained in the PSR. Nonetheless, consistent with the plea agreement between the parties, the government agreed to not recommend a sentence of more than 41 months' imprisonment.[2] (See Plea Agreement ¶ 5(b).)

### B.    A Two-Level "Minor" Role Reduction Should Not Be Applied

To date, the defendant has not filed any objections to the PSR, including the Guidelines calculation. However, based on the undersigned's communications with defense counsel, the undersigned anticipates that the defendant will assert that she is entitled to a two-level minor role reduction, pursuant to § 3B1.2(b). (See Plea Agreement ¶ 2.) The government disagrees. With the exception of reserving her right to argue that a minor role reduction is warranted, the defendant stipulated to the above Guidelines calculation. (Id.)

The defendant is not entitled to a minor role reduction, as she does not meet the criteria for such a reduction. The Guidelines provide that a defendant's base offense level may be reduced if the defendant was a "minor" participant. See U.S.S.G. § 3B1.2(b). The commentary defines a "minor participant" as a defendant "who is less culpable than most other participants."

---

[2]    41 months' imprisonment is the low-end of the Guidelines range for an adjusted offense level of 22.

U.S.S.G. § 3B1.2(b) and Application Notes 4-5. In fact, an adjustment under § 3B1.2 is appropriate only when a defendant is "*substantially* less culpable than the average participant." U.S.S.G. § 3B1.2(b), Application Note 3(A) (emphasis added).

A defendant has the burden of proving by a preponderance of the evidence that she is entitled to a mitigating role adjustment under § 3B1.2 of the Guidelines. See United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002); United States v. Castano, 234 F.3d 111, 113 (2d Cir. 2000); United States v. Colon, 220 F.3d 48, 51 (2d Cir. 2000). Moreover, a district court judge's analysis of the defendant's role in criminal activity is "'highly fact-specific and depends upon the nature of the defendant's relationship with other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise.'" United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001) (quoting United States v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993)).

The Second Circuit has repeatedly emphasized that a mitigating role reduction "'will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime.'" Carpenter, 252 F.3d at 235 (quoting United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999)); accord, e.g., United States v. Jeffers, 329 F.3d 94, 103 (2d Cir. 2003).

Here, the defendant's claim that her role was minor is simply belied by the facts. The defendant played a central and essential role in the charged conspiracy from the beginning. The defendant was more than a mere money courier, she was an equal partner with her late husband in their fraudulent business. Text messages recovered from the defendant's cellphone, pursuant to a judicially authorized search warrant, reveal that the defendant had full knowledge of the scheme, controlled the money (both depositing and withdrawing money from Victims' bank accounts), and alerted her late husband when no funds were available and they were charged-back for altered/fictitious checks. For example:

- On September 22, 2016, the defendant texted her late husband "Got clobbered today in Citibank 2450 1825 and 475" and then "I have plenty of money to deposit in citi 7 grand for tomorrow and 4500 in mail"

- On October 27, 2016, the defendant texted her late husband "Got 2 chargeback in city today 1875 and 475[;]" her late husband responded "Oh boy lets go over the tickets to run when u get time"

- On October 30, 2016, the defendant texted her late husband "The 1875 chargeback was [Victim][3] for altered fictious and 475 was [Victim] for warranty breach"

---

[3] "Victim" is used throughout but does not represent the same victim. There were hundreds of victims of the defendant's fraudulent scheme and each reference is to a different victim.

- On November 1, 2016, the defendant texted her late husband "No funds available for [Victim]" "at this time[;]" her late husband responded "Ok next week try 475"

- On November 4, 2016, the defendant texted her late husband "Acct got locked Kim is trying to unlock it" and "Kim's trying to get block off[;]" her late husband responded "Fraud Dept or clich [sic]"

- On November 4, 2016, the defendant texted her late husband "Found a do it myself check processing for 20 bucks signing up now" and "How many checks do we write a month 50[;]" to which the defendant's husband responded "Yes"

- On April 1, 2017, the defendant texted her late husband "I forgot to add [Victim] for 1375[;]" "It's total including [Victim] for 3450 is 17,450 less chargebacks net is 12,100" and "It's 17520 and net 12170 . . ."

- On October 28, 2017, the defendant texted her late husband "[Victim] was a chargeback for fictitious so it's the only ticket can't be run"

- On November 17, 2017, the defendant texted her late husband "Got this in fax from [Victim];" the defendant included a screenshot of the fax which stated "fraudulent charges" and "I just discovered a fraudulent charge to my acct on 11/13 for $1850." The defendant's late husband responded "Through in garbage."

- On May 9, 2018, the defendant texted her late husband "Apple bank is closing us got some information and have to cluse us by the 21 st[;]" the defendant's late husband responded "There are 7770 thousand credit unions in America /:/ I found the list so pick one and open an account /// personal or business or savings" and "forget about these creeps locally."

(See Extraction of Text Messages annexed hereto as Exhibit A.)[4]

As shown, the defendant's conduct was critical to the success of the conspiracy, and she was clearly aware of the nature and the scope of the conspiracy because she helped to execute the fraudulent scheme. There is no support for the argument that the defendant is "substantially less culpable than the average participant." In fact, although the government is not making such a claim, it is arguable that the defendant played in aggravating role in the conspiracy inasmuch as she recruited her members from her family, including a minor, to assist in stuffing and mailing envelopes to be mailed to elderly victims across the United States. (See Ex. A (March 23, 2017 text message from the defendant "[Family Member]" did 71 envelopes [Minor Family

---

[4]     As the text messages contain names of victims, the Exhibit is being filed under seal.

Member] did 155 they are all out of supplies" and May 29, 2017 the defendant texted "We went to post office with [Minor Family Member] envelopes all done"))

Accordingly, the defendant's claim that she is entitled to a two-level minor role reduction is meritless and should be denied.

III.    Argument

The Court's "starting point and the initial benchmark" when determining the defendant's sentence is the advisory Guidelines range of imprisonment. Kimbrough v. United States, 552 U.S. 85, 101 (2007). The government submits that a sentence of no more than 41 months would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence is warranted to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law, and (3) the need for specific and general deterrence. See 18 U.S.C. §§ 3553(a)(1), (a)92)(A)-(C).

Here, the extremely serious nature of the offense, the need for deterrence, the history and characteristics of the defendant, the need to promote respect for the law and to provide just punishment warrants a sentence of no more than 41 months' imprisonment.

A.    The Nature and Circumstances of the Office/Seriousness of the Offense

Section 3553(a) requires the Court to consider "the nature and circumstances of the offense" and to impose a sentence that "reflect[s] the seriousness of the offense." 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). Consideration of those factors strongly suggest a significant sentence is appropriate.

The seriousness of the offense speaks for itself: the defendant inflicted financial harm to hundreds of elderly persons. As described above, the defendant and her late husband victimized elderly individuals across the United States, tricking them into believing their biographies would be published in a registry and then stealing money directly out of the victims' bank accounts. The defendant was not a "minor" player in the fraudulent scheme; she was an equal partner with her late husband. She controlled the money (both depositing and withdrawing money from victims' bank accounts), and alerted her late husband when no funds were available and they were charged-back for altered/fictitious checks. Oftentimes, the defendant and her late husband continued to withdraw money from the victims' bank accounts stopping only when there was either no money left to withdraw from the victims' accounts or the banks were alerted to the fraudulent activity. In total, the defendant's victims lost more than $1.5 million.

Notably, the defendant engaged in deceitful tactics. She and her late husband created fraudulent checks, each that contained a stamp on the signature line that stated no signature was required. And, when the defendant's bank accounts were closed due to fraudulent activity, she opened up additional bank accounts with different banks and credit unions across the country and continued her criminal scheme.

Moreover, the length of the fraud warrants a substantial sentence. The defendant committed the fraud over the course of five years, only stopping when she was arrested. The

6

defendant did not have a one-time lapse in judgment. She made a daily decision to steal from the elderly for over five years.

Another factor in demonstrating the seriousness of the fraud warranting a significant sentence is the type of fraud this was: elder fraud. Unlike an accounting fraud, the defendant's fraud was very personal and targeted vulnerable members of the community: the elderly. Financial fraud against elderly Americans is a crime that is all too common in our society. (See, e.g., Yika Hayaski, Elder Fraud on the Rise, Wall Street Journal, February 27, 2019, https://www.wsj.com/articles/elder-fraud-on-the-rise-11551309306.) The defendant and her late husband used their skills to reach out to victims around the country, building on these victims' trust using falsehoods, and ultimately making millions of dollars in their criminal conspiracy. Elder fraud often deprives victims of important things that victims had worked hard and planned for all their lives. These include: a comfortable retirement; the security of not having to worry that much about finances as a senior; and the ability to spend time with, and provide meaningful support for, family members. Moreover, while the financial losses are staggering, they are by no means the only harm. A common reaction is humiliation and anxiety. Victims blame themselves for being "stupid" to fall for the scheme. They often hide their losses from family and become anxious about answering the phone or checking email. These effects can linger for years.

The fact that the defendant and her late husband did not break windows or doors to take their victims' assets from them, that they didn't point firearms at their victims to get them to hand over their assets, and did not threaten their victims with bodily harm in no way diminishes the seriousness of this offense. Indeed, the use of technology, guile and other subtle and sophisticated means to achieve their criminal goals makes the defendant a particularly devious and dangerous actor.

B.    Nothing in the Defendant's Background Provides Compelling Mitigation

The next factor that the Court must consider is the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The circumstances of the defendant's upbringing, family structure, and lack of criminal history, should certainly be considered, but they must also be balanced with the nature and gravity of the instant offense.

Despite the fact that the defendant has no criminal history, her conduct was not aberrant behavior as the result of her relationship with her late husband. As noted above, the defendant's conduct extended over a period of five years. The defendant is an intelligent woman, and her conduct was not a momentary aberration or lapse of reason. Nor does the defendant's lack of criminal history mitigate against a significant sentence. The applicable Guidelines range already reflects the defendant's limited criminal history, placing her in the lowest possible criminal history category. As such, her lack of criminal history does not merit an additional variance.

Further, the defendant's age and educational background when she committed the instant crime counsels against a reduced sentence. Indeed, she was 49 years old when she started stealing from the elderly; she was not a child. And she had a degree from a fine educational institution.

The defendant's positive upbringing also warrants a significant sentence.  As the defendant explained, she had a "'perfect' childhood, devoid of abuse, [ ] that she socialized constantly, and her parents 'made marriage look easy.'"  (See PSR ¶ 35.)  The defendant, unlike so many defendants that appear for sentencing, was raised by two loving parents in a home devoid of physical or verbal abuse.  The defendant did not suffer from mental health or substance abuse problems that led her to commit this fraud.  The defendant had every opportunity to lead a productive, law-abiding life:  she had a positive upbringing and a supportive, loving family.  Despite all of this, she chose to defraud unsuspecting victims.  And she should be punished accordingly.  What makes the defendant's criminal conduct so appalling is that she learned work ethic from her parents and witnessed first-hand how hard her parents worked to provide for her and her brother.  Instead of following her parents' path, she chose a different path, an easier path.  A path where she victimized people who, like her parents, worked to provide a better life for their families.

Moreover, the fact that the defendant is the primary caregiver for her mother and is the sole surviving parent to her son does not warrant a reduction in her sentence.  It is unfortunate – but neither unexpected nor extraordinary – that a defendant's criminal conduct may negatively affect her family.  Cf. United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (noting that the defendant mother's separation from her children, although unfortunate, was a common collateral damage of imprisonment).

C.    The Need for Both Specific and General Deterrence is High

The needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a substantial sentence.  See 18 U.S.C. §§ 3553(a)(2)(A), 2(B).  This Court has a responsibility to send clear, unambiguous messages that financial crimes will be punished.  If that message is muted, criminals will quickly learn that blatant million-dollar fraud schemes do not merit significant prison sentences.

Here, in light of the defendant's choice to commit years of financial fraud in this case, there is a strong and self-evident need for specific deterrence.

Moreover, given the amount of money the defendant stole as part of her fraudulent scheme, those who are given the opportunity to participate in a fraud where they receive millions of dollars will not be deterred if the defendant is not punished severely.  That is particularly so because frauds involving private companies, like here, are, by their very nature, opaque to law enforcement officers, and thus essentially difficult to detect and prosecute.

White collar criminals are among the most responsive to the general deterrence of a significant sentence.  Unlike many of the criminals who pass through this Court, white collar criminals or those considering committing financial crimes are generally well-educated, have access to and are more acutely aware of information about white collar sentences.  A significant sentence for the defendant can help protect the public by providing strong general deterrence to the next person considering participating in fraud.  There is a greater need for general deterrence for sophisticated fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240

(11th Cir. 2006) (quoting Stephanos Bibas, <u>White-Collar Plea Bargaining and Sentencing After</u> <u>Booker,</u> 47 Wm. & Mary L. Rev. 721, 724 (2005) (internal quotation marks omitted); <u>United States</u> <u>v. Heffernan</u>, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago, Francesco, Roberto Galbiati & Pietro Vertova, <u>The</u> <u>Deterrent Effects of Prison: Evidence From a Natural Experiment</u>, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").

IV.    <u>Conclusion</u>

        For the reasons set forth herein, the government submits that a sentence of no more than 41 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentence.  <u>See</u> 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

BREON PEACE
United States Attorney

By:    _____/s/_____
Catherine M. Mirabile
Assistant U.S. Attorney
(631) 715-7850

cc:    Kevin Keating, Esq.
Counsel for the Defendant